# In the
# United States Court of Appeals
# for the Third Circuit

**Cumberland Valley School District,**
**Appellant**

v.

**Kevin and Denise Culley, on Behalf of J.C.**
**Appellees**

**On Appeal from the**
**United States District Court for the**
**Middle District of Pennsylvania**
**No. 1:15-CV-0857-JEJ**
**The Honorable John E. Jones, III**

## BRIEF OF APPELLEES KEVIN AND DENISE CULLEY

JUDITH A. GRAN
REISMAN CAROLLA GRAN LLP
Attorney I.D. No. 40134
19 Chestnut Street
Haddonfield, NJ 08033
856.354.0021

PHILLIP A. DRUMHEISER
Attorney I.D. No. 90003
P.O. Box 890
Carlisle, PA 17013

*Attorneys for Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................ii

I.    STATEMENT OF SUBJECT-MATTER AND APPELLATE
      JURISDICTION ........................................................................................... 1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................. 2

III.  STATEMENT OF RELATED PROCEEDINGS ......................................... 2

IV.   STATEMENT OF THE CASE ..................................................................... 2

V.    STATEMENT OF FACTS ........................................................................... 4

VI.   STATEMENT OF THE STANDARD OF REVIEW ................................... 9

VII.  SUMMARY OF ARGUMENT .................................................................. 11

VIII. ARGUMENT .............................................................................................. 13

      A.    The District Court Did Not Err When It Reversed the Hearing
            Officer's Holding that the District's Evaluation was Appropriate…13

      B.    The District Court Did Not Err When It Reversed the Hearing Officer's
            Holding that J.C. Was Not Eligible for Special Education and Related
            Services Under IDEA ........................................................................ 18

            1.    The Hearing Officer Erred in Holding that J.C.'s Disabilities Did
                  Not Affect His Education ............................................................. 19

            2.    The Hearing Officer Erred in Concluding that J.C. Did Not Need
                  Specially Designed Instruction if His Overall Academic
                  Achievement Was Satisfactory ................................................... 26

      C.    The District Court Did Not Err When It Reversed the Hearing Officer
            and Held that the District Violated its Child Find Duty Under Section
            504 ..................................................................................................... 30

1.    The District, Not the Parents, Was Responsible for Failing to Identify J.C as a Student with Disabilities ................................... 30

2.    The District Stood by as J.C. Experienced a Pervasive Loss of Educational Benefit Without Considering His Need for Accommodations and Specially Designed Instruction ............... 32

3.    The Hearing Officer Ignored Relevant Evidence and Made Other Errors of Law and Fact ................................................. 34

IX.    CONCLUSION ........................................................................ 38

CERTIFICATIONS ........................................................................ 40

CERTIFICATE OF SERVICE ............................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation,* 490 F.3d 337 (3d Cir. 2007) .................................................................................. 9
*Bd. of Educ. v. L.M..,* 478 F.3d 307 (6th Cir. 2007) .................................................. 28
*Beauchamp v. Anaheim Union High Sch. Dist.,* 816 F.3d 1216 (9th Cir. 2016) .... 11
*Carlisle Area Sch. Dist. v. Scott P.,* 62 F.3d 520, n.3 (3d Cir. 1995) .................... 10
*D. K. v. Abington Sch. Dist.,* 696 F.3d 233 (3d Cir. 2012) .................................... 28
*Doe v. Cape Elizabeth Sch. Dist.,* 832 F.3d 69 (1st Cir. 2016) ....................... 11, 27
*Elida Local Sch. Dist. Bd. of Educ. v. Erickson*, 252 F. Supp. 2d 476 (N.D. Ohio 2003).................................................................................................................. 27
*Endrew F. v. Douglas County Sch. Dist. RE-1,* 137 S. Ct. 988 (2017) ................. 35
*G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455 (E.D. Pa. 2011)................... 17
*Indep. Sch. Dist. No. 701 v. J.T.,* No. 05-1892 (DWF/RLE), 2006 U.S. Dist. LEXIS 8474 .................................................................................................... 17
*J.C. v. Central Regional Sch. Dist.,* 81 F.3d 389 (3d Cir. 1996) ........................... 32
*Jana K. v. Annville-Cleona Sch. Dist.,* 39 F. Supp. 3d ................................... 28, 32
*L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384 (3d Cir. 2006)................................... 10
*L.J. v. Pittsburg Unified Sch. Dist.,* 835 F.3d 1168 (9th Cir. 2016) ...................... 27
*Lauren G. v. West Chester Area Sch. Dist.,* 906 F. Supp. 2d 375 (E.D. Pa. 2012) 30
*Lauren P. v. Wissahickon Sch. Dist.,* 310 Fed App'x 552 (3d Cir. 2009).............. 17
*Mr. I v. Me. Sch. Admin. Dist. 55*, 416 F. Supp. 2d 147 (D. Me. 2006) ................ 27
*N.R. v. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572 (3d Cir. 2000)....................... 10
*Neosho R-V Sch. Dist. v. Clark,* 315 F.3d 1022 (8th Cir. 2003)............................ 17
*Penn Trafford Sch. Dist. v. C.F.,* No. Civ. A. 04-1395, 2006 U.S. Dist. LEXIS 13581, 2006 WL 840334 .................................................................................. 17
*Polk v. Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171 (3d Cir. 1988).... 10
*S.H. v. State-Operated Sch. Dist.,* 336 F.3d 260 (3d Cir. 2003) ............................ 10
*Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194 (3d Cir. 2004) ............... 9
*Taylor v. Altoona Area Sch. Dist.,* 737 F. Supp. 2d 474 (W.D. Pa. 2010) ............. 28
*W.B. v. Matula,* 67 F.3d 484 (3d Cir. 1995) ........................................................ 28
*Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138 (2d Cir. 2002) ................................ 27

## Federal Statutes

20 U.S.C. § 1414(b)(3)(B) ..................................................................................... 14
20 U.S.C. § 1415(C)(iii) ........................................................................................ 10

20 U.S.C. § 1415(f)..................................................................................... 1
20 U.S.C. § 1415(i)(2) ........................................................................passim
20 U.S.C. § 1415(i)(2)(B) ......................................................................... 10
20 U.S.C. §§ 1414 (d)(3)(A)(i)-(iv) ......................................................... 35
20 U.S.C. §§ 1414(a)(1)(C)(i)(II) ............................................................ 13
20 U.S.C. §§ 1414(a)(2)(A) ...................................................................... 13
20 U.S.C. §§ 1414(b)(2)(A)(ii) ................................................................. 13
20 U.S.C. §§ 1414(b)(3)(B) ...................................................................... 13
20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV) ..................................................... 35
28 U.S.C. § 1291 ........................................................................................ 1
28 U.S.C. § 1331 ........................................................................................ 1
29 U.S.C. § 794 ......................................................................................... 1

## Regulations

34 C.F.R. § 104.4(b) ............................................................................... 30
34 C.F.R. § 300.111(c)(1) ........................................................................ 27
34 C.F.R. § 300.7(c)(9) .............................................................................. 3
34 C.F.R. § 300.8(c)(8) ............................................................................ 28
34 C.F.R. §§ 300.304 (2) .......................................................................... 13
34 C.F.R. §§ 300.304 (4) .......................................................................... 13
34 C.F.R. §§ 300.304 (6) .......................................................................... 13
34 C.F.R. §§ 300.304 (7) .......................................................................... 13
34 C.F.R. §§ 300.304(c)(1)(ii—iv)........................................................... 14

## State Administratice Decisions

*Board of Education of the Ramapo Central School District,* 106 LRP 24184 (New York State Educational Agency, 92-5, 92-6 (February 20, 1992)...................... 25
*Boston Public Schools,* 109 LRP 48225 (Massachusetts State Educational Agency, No. 06-6508, August 11, 2006) ........................................................ 25

# I. STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This action arising under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2) (hereinafter "IDEA"), was brought to appeal the decision of a Pennsylvania Special Education Hearing Officer. The underlying administrative action was brought by Kevin and Denise Culley, the Parents of J.C., against the Cumberland Valley School District (hereinafter "District") under IDEA, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") and their implementing regulations.

The Parents challenged the failure of the District to find J.C. eligible for specially designed instruction and related services under IDEA and Section 504 and sought compensatory education as a remedy. The District Court had jurisdiction under 28 U.S.C. § 1331, this being an action arising under the laws of the United States, and 20 U.S.C. § 1415(i)(2), which confers jurisdiction upon the district courts of the United States over civil actions brought by a party aggrieved by the findings and decision made by an administrative hearing officer with respect to a complaint filed pursuant to 20 U.S.C. § 1415(f).

This Court has appellate jurisdiction under 28 U.S.C. § 1291, this being an appeal from a final order of the District Court that disposes of the parties' claims. The District Court entered judgment on December 7, 2017, and the District filed its Notice of Appeal on December 21, 2017.

## II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err when it reversed the Hearing Officer's determination that the School District's Evaluation Report was appropriate? Brief and Appendix of Appellant, Cumberland Valley School District (hereinafter "App. Br.") at 4.

    Proposed Answer: NO.

2.    Did the District Court err when it reversed the Hearing Officer's finding that J.C. was properly not IDEA eligible? App. Br. at 4.

    Proposed Answer: NO.

3.    Did the District Court err when it reversed the Hearing Officer and found that the District violated its Child Find Duty under Section 504? App. Br. at 4.

    Proposed Answer: NO.

## III.    STATEMENT OF RELATED PROCEEDINGS.

This matter has not been before this Court heretofore. Appellees are not aware of any other case or proceeding that is related to the present case.

## IV.    STATEMENT OF THE CASE

On February 3, 2015, the Hearing Officer issued his decision, ruling in favor of the District and dismissing J.C.'s claims.  The Hearing Officer held that J.C. was not eligible for special education services and compensatory education pursuant to the Individuals with Disabilities Education Act (IDEA), that he had not been eligible for Section 504 services prior to March 2014, that he was not entitled to compensatory education services and was not discriminated against pursuant to

Section 504.

On May 3, 2015, the Parents timely appealed the hearing officer's decision

to the District Court. District Court Doc. 1. On March 21, 2016, plaintiffs filed an

Amended Complaint, Doc. 23, to which the defendant filed an Answer on April 6,

2016. Doc. 24. On November 18, 2016, the Parents filed a Motion to Supplement

the Administrative Record with Additional Evidence, asking the Court to

supplement the record with three documents: (1) The Evaluation Report of East

Pennsboro School District dated November 14, 2014, finding that J.C. is a student

with disability in need of specially designed instruction and eligible under IDEA as

a student with Other Health Impairment[1] and Emotional Disturbance; (2) The IEP

developed for J.C. by the East Pennsboro School District; and (3) the Notice of

Recommended Educational Placement from East Pennsboro School District,

placing J.C. in a program affording special education services. Doc. 30. On

January 30, 2017, the Court granted the motion. Doc. 34.

The parties filed cross-motions for judgment on the record, as supplemented

by the additional evidence, on April 7, 2017. Doc. 38, Doc. 40. On November 6,

2017, the District Court issued its decision. Doc. 44. The Court granted the

---

[1]The IDEA regulation defines "Other Health Impairment" as "having limited
strength, vitality or alertness . . . that results in limited alertness with respect to the
educational environment, that - (i) is due to chronic or acute health problems . . .;
and (ii) adversely affects a child's educational performance." 34 C.F.R. §
300.7(c)(9).

Parents' motion to the extent that the Hearing Officer erred in concluding that the District did not violate the IDEA by failing to find J.C. eligible for special education and related services; in concluding that the District did not violate its Child Find duty; and in concluding that the District did not violate Section 504 by failing to identify J.C. as a protected handicapped student prior to March, 2014. The Court granted the District's motion to the extent that it found that the District did not discriminate against J.C. underfdq the Americans with Disabilities Act or Section 504 of the Rehabilitation Act. The Court denied the motions in all other respects.

On December 6, 2017, the parties entered into a Joint Stipulation on Remedy, which was approved by the Court the following day in the entry of a final order. Doc. 45, Doc. 46. This appeal followed. Doc. 47.

## V.     STATEMENT OF FACTS

J.C. is a former student in the Cumberland Valley School District ("District"). He was diagnosed with Crohn's Disease in 2004. A38. J.C.'s Parents informed the District of this diagnosis in October, 2007 in a note from J.C.'s mother. A38, A53. Crohn's disease causes inflammation of the gastrointestinal (GI) tract and interferes with the body's absorption of nutrients through the intestinal wall. In J.C.'s case, this has caused severe anemia, pain and extreme fatigue. Because J.C. is unable to take in sufficient nutrition, his growth has been

stunted and abnormal. N.T. 303-305, 306, 354, 376[2];  A170, 171 n. 1, A188. At the age of fifteen, he had the bone structure of an eleven-year-old child and an abnormal gait. N.T. 304. Psychologist Margaret Kay, who conducted at Independent Educational Evaluation of J.C., described him as very small in stature, withdrawn, tired, listless and apathetic and apparently physically fatigued, with very low energy levels. A173.

J.C.'s Crohn's Disease and associated disabilities have affected his performance in school. His chronic and persistent fatigue and lack of energy affect his ability to complete his work in a timely fashion, and to complete the volume of work that is expected of his peers. This has severely depressed his grades. J.C. also has missed a significant amount of school because of the manifestations of Crohn's Disease. He has had emotional difficulties caused both by the disease and by the medication used to treat the disease, which causes depression, fatigue and an inability to concentrate. A167, A188-189; N.T. 304, 376.  J.C. has had increased difficulty with alertness, attention, concentration and organization as his illness became more severe. N.T. 303, 382. Independent psychologist Margaret Kay concluded that he has Attention Deficit Disorder. A168-169, A171-173, A182, A185-187, A189, A191.

During J.C.'s high school years, his academic performance declined and his

---

[2]References are to Notes of Testimony ("N.T.") of the due process hearing below.

attendance worsened. A231-232; N.T. 148, 193, 195.  In the 2011-2012 school

year, J.C. had 16 absences, eight unexcused tardies, and a 73.96 grade point

average ("GPA"). A169-170. In 2012-2013, J.C. had 22.5 absences, 17 tardies, and

a 74.52 GPA. He visited the school nurse 28 times and was sent home nine times,

in part because of gastrointestinal problems. *Id.* His GPA for 2012-2013 was

74.52. A170.  In the 2013-14 school year, his last at Cumberland Valley High

School, J.C. was absent for 43 of 135 days, visited the school nurse five times, and

was sent home once. A170-171.

On January 17, 2014, an incident in school led District officials to institute

disciplinary proceedings against J.C.  A38 ¶ 6, A39 ¶ 11. On January 29, 2014,

Plaintiffs filed their initial due process complaint, alleging that the District had

failed to evaluate J.C. for eligibility for special education services under IDEA and

Section 504. Brief in Support of Defendant's Motion for Judgment on the

Administrative Record, District Court Doc. 39 at 5. In response to the complaint,

the District held the disciplinary hearings in abeyance and agreed to evaluate J.C.

A39 ¶ 15.

On February 21, 2014, the District issued a Permission to Evaluate Consent

Form. The District requested the Parents' consent for the following types of tests

and assessments:

> Review of records including medical documentation
> Parent input

6

Teacher input
Intelligence testing
Achievement testing
Social/emotional/behavioral assessments
Functional behavior assessment.
Executive function.

A84. The Parents executed the consent form on March 12, 2014. The Parents also

consented to the District's proposed evaluation of J.C. for eligibility under Section

504. A88. The District proceeded with its evaluation and administered assessments

of social, emotional and behavioral functioning, including the Adolescent

Psychopathology Scale (Self-Report), the Reynolds Adolescent Depression Scale,

the Revised Children's Manifest Anxiety Scale and the Child Behavioral Checklist.

The District's Evaluation Report indicates that J.C. received scores in the clinically

significant range on these tests. A145-150.

In March, 2014, the District found J.C. eligible for a Section 504 Service

Plan. It finalized a plan for him on April 1, 2014. A92.

Meanwhile, on March 25, 2014, the District issued a second Permission to

Evaluate Consent Form, this time asking the Parents' consent for a psychiatric

evaluation. A95. The Parents responded on April 1, 2014, that they would pursue a

private psychiatric evaluation and provide the results to the District. A96. The

District did not object. A40 ¶ 23.

Shortly after the Parents signed the 504 agreement, on April 4, 2014, the

District received a letter from J.C.'s physician recommending half of J.C.'s day be

in homebound instruction and the other half in vocational school. A40 ¶ 24.

Defendant attempted to provide J.C. with homebound instruction with mixed

results; J.C. was unmotivated, difficult to instruct, and sometimes not

even present for the homebound sessions. A112-116.

On April 7, 2014, the school board voted to expel J.C. from the District for

one year. Brief in Support of Defendant's Motion for Judgment on the

Administrative Record, District Court Doc. 39 at 4. The expulsion became

effective on May 8, 2014. *Id.* On the same day, the District issued an Evaluation

Report ("ER"). The report concluded that J.C. was not eligible for special

education under IDEA. A123, A152.

The Parents obtained an Independent Educational Evaluation (IEE) from a

school psychologist who found J.C. to be an eligible student in the categories of

Other Health Impairment and Specific Learning Disability. A189. The

psychologist conducted a significant amount of testing to support her findings and

recommended an extensive list of specially designed instruction to meet J.C.'s

needs.  A162-191.

After he was expelled, J.C.'s family moved to a neighboring school district,

East Pennsboro. The new school district conducted an evaluation of J.C. and

determined that he was eligible for services under IDEA as a student with Other

Health Impairment and Emotional Disturbance. A241. The evaluation included a

private psychiatric evaluation completed by Shawna S. Brent, M.D., board certified adolescent and child psychiatrist, on October 17, 2014.  A233-234. Dr. Brent diagnosed J.C. with anxiety related to chronic medical illness and Attention Deficit Hyperactivity Disorder, primarily inattentive type. A234.

East Pennsboro issued an IEP for J.C., East Pennsboro Area School District, Individualized Education Program, December 9, 2014, containing goals in assignment completion and organizational skills. A253, A269-The IEP contained specially designed instruction providing that if J.C. misses school or classes due to his disability, he will be provided with teacher notes or classroom notes from a designated peer as soon as practicable after the missed class. The IEP also provided that J.C. could e-mail his teachers or contact designated peers for help in each of his classes. A270, A274. J.C.'s homework and tests were modified to allow him to demonstrate mastery with fewer questions. His academic performance increased after he received this modification in his assignments. N.T. 313.

## VI.   STATEMENT OF THE STANDARD OF REVIEW

When reviewing an administrative decision under IDEA, both the District Court and the Court of Appeals use a "modified *de novo*" standard. *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation,* 490 F.3d 337, 344 (3d Cir. 2007), *citing Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).  The District Court receives the records of the administrative

proceeding, hears additional evidence at the request of a party, and based on its analysis of the preponderance of the evidence, grants "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B), (C)(iii).

In a motion for judgment on the administrative record, the District Court conducts a "modified *de novo* review" and gives due weight to the factual findings of the hearing officer. *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 389 (3d Cir. 2006). "Due weight" means that the hearing officer's factual findings are to be considered prima facie correct and that if the Court declines to follow them, it must explain its reasons. *S.H. v. State-Operated Sch. Dist.,* 336 F.3d 260, 270 (3d Cir. 2003). The District Court and the Court of Appeals exercise plenary review over the hearing officer's legal conclusions. *Carlisle Area Sch. Dist. v. Scott P.,* 62 F.3d 520, 528 n.3 (3d Cir. 1995).

The Court of Appeals exercises plenary review of the question whether the District Court applied the correct legal standards under the IDEA, *see Polk v. Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171, 181 (3d Cir. 1988). The Court of Appeals reviews the District Court's factual findings for clear error. *T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572, 576 (3d Cir. 2000). "A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed." *P.S., quoting Oberti,* 995 F.2d at 1204.

The standard of review for each of the issues presented for review is as follows:

**Issue No. 1:** We have found no case law concerning the standard of review for the appropriateness of an Evaluation Report. However, we suggest that the standard of review governing the appropriateness of an Individualized Education Program ("IEP"), that accorded a mixed question of law and fact, is analogous. Under that standard, review of the District Court's conclusion that the Evaluation failed to comply with statutory standards is plenary.

**Issue No. 2:** The standard of review for an eligibility determination is that applicable to legal questions. *See Doe v. Cape Elizabeth Sch. Dist.,* 832 F.3d 69, 87 (1st Cir. 2016) (Lipez, J., concurring) (characterizing eligibility under IDEA as a legal issue).

**Issue No 3:** The standard of review for a determination that a school district violated its Child Find duty is that applicable to legal questions. *Beauchamp v. Anaheim Union High Sch. Dist.,* 816 F.3d 1216, 1222 (9th Cir. 2016) (characterizing the issue whether a school district has violated its Child Find duty as a legal issue).

## VII.  SUMMARY OF ARGUMENT.

The District Court correctly rejected the Hearing Officer's conclusion that J.C., a student with Crohn's disease and Attention Deficit Disorder, Inattentive

Type, was not eligible for services under the Individuals with Disabilities Education Act. In reaching his legal conclusion, the Hearing Officer relied on an evaluation by the District's school psychologist that the District Court found was "incomplete." The District Court's finding that the District's evaluation was incomplete is thoroughly justified by the content of that evaluation, as the District psychologist made no real attempt to ascertain whether J.C. has Attention Deficit Disorder, although the observations by J.C.'s teachers gave ample reason to suspect that J.C. had this disability.

The District Court was correct in finding that the Hearing Officer erred in discounting the Independent Educational Evaluation conducted by school psychologist Margaret Kay. The Hearing Officer dismissed Dr. Kay's finding that J.C. had a specific learning disability in mathematics, and by extension discounted the entire evaluation on the ground that J.C.'s performance in mathematics was "strong," a conclusion that is belied by the evidence of J.C.'s poor performance. Dr. Kay evaluated J.C. for Attention Deficit Disorder ("ADHD"), as the District psychologist had failed to do, and found that J.C. was eligible for services under IDEA by virtue of both ADHD and Crohn's disease as a student with Other Health Impairment.

The Hearing Officer ignored significant evidence of J.C.'s declining educational performance from seventh grade to the time of the due process hearing,

when J.C. was in tenth grade. Despite above-average intelligence, in each year after sixth grade, J.C. obtained a Grade Point Average only a few points above failing. He had multiple absences and failed numerous classes. Incongruously, the Hearing Officer characterized J.C.'s academic performance during these years as "strong." This mischaracterization was, in turn, the basis for the Hearing Officer's inaccurate conclusion that J.C.'s Crohn's disease did not affect his educational performance.

The long record of J.C.'s poor performance in school, along with the observations of his teachers and the evaluative findings of Dr. Kay, establish not only his eligibility for services but also that he should have been found eligible for services under Section 504 of the Rehabilitation Act long before March, 2014, when he was finally identified as a protected handicapped student.

## VIII. ARGUMENT.

### A. The District Court Did Not Err When It Reversed the Hearing Officer's Holding that the District's Evaluation was Appropriate.

Under IDEA, it is the obligation of every local school district to assess potentially eligible students in all areas of suspected disability and to conduct evaluations and reevaluations that are "sufficiently comprehensive to identify all of the child's special education and related service needs," and provide "relevant information that directly assists" in determining the child's educational needs. 20 U.S.C. §§ 1414(a)(1)(C)(i)(II), 1414(a)(2)(A), 1414(b)(2)(A)(ii), 1414 (b)(3)(B);

13

34 C.F.R. §§ 300.304(c)(1)(ii—iv), (2), (4), (6), (7).

The District Court found that the district psychologist conducted only a "partial evaluation." The Court held that "[b]ecause of the inconsistency and incompleteness of the district psychologist's evaluation, we disagree with the hearing officer's finding that the district psychologist's conclusions were 'well-supported' by her evaluation." A14. The District's response is to emphasize that the District's evaluation included the requisite formal components of an initial evaluation. App. Br. at 8-9, 10-11.[3]

Yet even with respect to IDEA's formal requirements for an evaluation, the District fell short. It did not actually evaluate J.C. in all areas of suspected disability, as required by 20 U.S.C. § 1414(b)(3)(B). The District did not seriously evaluate J.C. for Attention Deficit Disorder, as did Dr. Kay and the East Pennsboro School District. Nor did it evaluate him for a Specific Learning Disability in Mathematics, as Dr. Kay did. Even worse, the District ignored the red flags in the instruments it did administer. The results of its own testing indicated that J.C. might well have deficits in attention and concentration, yet it failed to follow up

_____

[3] The District also recites a litany of cases urging deference to the expertise of school officials and hearing officers, but does not analyze how the principles enunciated in these cases apply to the District's evaluation. The District Court accorded the deference due to the Hearing Officer's findings in proceedings such as this, that is, in every instance in which the Court disagreed with the Hearing Officer's findings, it explained its disagreement. A12.

with additional testing to confirm or rule out that J.C. has those suspected disabilities.

The only measure of J.C.'s ability to attend and concentrate that the District's evaluator administered was the Working Memory Index of the WISC-IV. J.C. performed in the 61st percentile on this index. A138. However, the evaluator administered a more specific test of attentional deficits, the Computer Performance Test, that strongly suggested (by a probability of 78.83%) that J.C. had ADHD to a clinically significant degree. Yet the evaluator discounted those results because J.C. was checking his phone during administration of the test, and did nothing to follow up with more accurate testing. A143.

The evaluator also administered tests of executive functioning that strongly suggested that J.C. is significantly impaired in his ability to attend and concentrate, yet did nothing to confirm these results. The District administered the Comprehensive Trail-Making Test (CTMT), a test of executive functioning. J.C. scored in the 3rd percentile (Mild to Moderate Impairment) on the component of the CTMT that "strongly involves attention to task." A143. The evaluator stated that this result might have been skewed by J.C.'s checking his phone during the testing, *id.,* but did nothing to correct for this flaw in the manner in which the test was administered or to follow up with a more accurate measure.[4]

_____

[4] Curiously, the author of the Evaluation Report stated that "[t]he assessments were

The District also administered the BRIEF, another test of executive functioning, but only to J.C. parents. A144-146. Executive functions are "mental processes that direct a child's thought, action and emotion, particularly during active problem-solving." A144. J.C's father rated him in the Clinically Significant range in the areas of Working Memory (an executive function that is needed to sustain attention), Plan/Organize, the Metacognition Index and the Global Executive Composite. Again, the District did nothing to follow up and confirm or rule out these results. In light of the significant evidence from J.C.'s teachers of his extreme difficulty concentrating and attending in class, A125-130, the District had an obligation to do so.

Finally, the sections of the Evaluation Report designed to report the result of an analysis whether J.C. has a Specific Learning Disability are blank. The District never seriously considered whether J.C. had a Specific Learning Disability in mathematics or any other area. A150, A155-156.

In contrast, the Independent Educational Evaluation conducted by Margaret Kay included valid results of multiple tests of attention and concentration. A162. Dr. Kay's finding that J.C. had Attention Deficit Disorder were amply supported by her testing results. A182 (BASC-2); A185-187 (Woodcock-Johnson-III-NU/Tests of Cognitive Ability Auditory Attention subtest; Brown Attention Deficit

_____

conducted under standardized conditions without variation." A150.

Disorder Scales; Clinical Assessment of Attention Deficit-Child; Conner's 3rd Edition). Dr. Kay's finding that J.C. had a Specific Learning Disability in mathematics was also well supported by her testing results. A180.

Even if J.C. had been making adequate academic progress (and, as we have explained, he was not), he was entitled to an evaluation by the District of the difficulties in attention and concentration that impeded his learning. Here, as in *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 465-67 (E.D. Pa. 2011), the District had an obligation to look beyond J.C.'s cognitive potential and address the attentional issues that plainly were impeding his educational progress and success. See *Lauren P. v. Wissahickon Sch. Dist.,* 310 Fed App'x 552, 554-55 (3d Cir. 2009) (concluding that defendant's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE"); *Neosho R-V Sch. Dist. v. Clark,* 315 F.3d 1022,1029 (8th Cir. 2003) (accord); *Penn Trafford Sch. Dist. v. C.F.,* No. Civ. A. 04-1395, 2006 U.S. Dist. LEXIS 13581, 2006 WL 840334, at *8 (W.D. Pa. March 28, 2006). Where an evaluation is missing significant data and is inadequate to support to make a determination whether the Student has a specific learning disability, a Court's finding that it is inappropriate is fully justified. *See Indep. Sch. Dist. No. 701 v. J.T.,* No. 05-1892 (DWF/RLE), 2006 U.S. Dist. LEXIS 8474, at *37-38 (D. Minn. Feb. 28, 2006).

The District makes much of the Parents' failure to consent to its proposed

psychiatric evaluation, as though that might have made a difference to its determination of J.C.'s eligibility. App. Br. at 13-14. In declining consent for the District's psychiatric evaluation, the Parents informed the District that they would obtain their own evaluation. A95, A96. The District did not object or attempt to override the parents' lack of consent by filing its own due process complaint. A40 ¶ 23. The Parents' response was sent on April 1, 2014, only six days before the school board voted to expel J.C. for one year, and a little over a month before the expulsion became effective and the District issued its Evaluation Report finding that J.C. was not eligible. It is difficult to see how a psychiatric evaluation could have affected either result.

More important, in its evaluation of J.C., the District gathered a significant amount of data concerning J.C.'s emotional and behavioral needs, A145-150, and established that he had clinically significant scores in these areas. Indeed, the variety of testing the District conducted in this area contrasts sharply with its failure to analyze his needs in the areas of attention and concentration. *See supra* at 14ff.  Had the District been inclined to identify J.C. as a student with emotional disturbance, it could have justified that conclusion on the basis of its evaluation alone.

**B.**     **The District Court Did Not Err When It Reversed the Hearing Officer's Holding that J.C. Was Not Eligible for Special Education and Related Services Under IDEA.**

**1.** **The Hearing Officer Erred in Holding that J.C.'s Disabilities Did Not Affect His Education.**

The Hearing Officer's conclusion that J.C. was not eligible for specially designed instruction and related services was factually and legally incorrect. His analysis was based on the following propositions:

(1)     J.C.'s performance in school was satisfactory until tenth grade, when his grades plummeted. A48.

(2)     The decline in J.C.'s grades was "closely connected" with a "significant increase in absences." A48.

(3)     J.C.'s claim to eligibility on the basis of Other Health Impairment was based on his diagnosis of Crohn's disease. A47-48.

(4)     To prove J.C.'s eligibility, the parents were required to prove that his poor academic performance was caused by Crohn's disease. A48.

(5)     Since J.C.'s poor academic performance was caused by a large number of absences, the parents must prove that the large number of absences were caused by Crohn's disease. A48.

(6)     The parents did not prove that a sufficiently large number of absences were caused by Crohn's disease. A49.

(7)     Therefore, the parents failed to prove J.C.'s eligibility as a student with Other Health Impairment. A49.

The Hearing Officer's reasoning was marred by the following logical and evidentiary errors.

(1)     The Hearing Officer's premise that J.C.'s academic performance was satisfactory until tenth grade is erroneous. As early as seventh grade, J.C. began a

pattern of excessive absences and poor academic performance. His GPA in seventh grade was 70.41, and he had 14 absences and 17 unexcused tardies. He failed six courses. A169.  In eighth grade, J.C.'s GPA was 73.96. He had 16 absences and 8 unexcused tardies. He failed 5 courses. A169. In ninth grade, J.C. had a GPA of 74.52. He had 22.5 absences and 17 tardies (not 14.5 absences as the Hearing Officer erroneously stated, A38 ¶ 3).[5] He failed Introduction to Business (although the Hearing Officer claimed, erroneously, that he passed all academic classes, A38 ¶ 4). His teachers reported that he failed to submit his assignments on time, had poor test grades and was absent so often that it affected his classroom performance. A169.

The Hearing Officer characterized J.C.'s grade point average of 74.52 as "strong performance under the circumstances without accommodations." A48. He cited no authority for the conclusion that maintaining a D average for a year is "strong" performance for a student with an IQ of 107. *See* A69.

(2)     The Hearing Officer ignored the evidence that J.C. was inattentive and disengaged when he was not absent. The Teacher Input in the District's Evaluation Report rated J.C.'s class participation, test taking, listening comprehension,

---

[5] The Hearing Officer based his finding on a document that appears to be a partial listing of absences during J.C.'s 9th grade year, as it ends on March 18, 2013. A70. On the previous page of the District's Appendix, a more accurate number, 21.50, is stated. A68.

following directions and attention to instruction as "poor" or "needs improvement." A126. His English teacher reported, in a running log kept from February 10, 2014 to March 21, 2014, that J.C. wrote nothing down and did no work in class; that he had his head down on his desk while the class watched a film, that he slept through class (on three days) and that he did not follow along with the class in reading. J.C. frequently spent 15 minutes in the bathroom at a time. A128. The school nurse's notes show that during the 2012-13 school year, J.C. made 28 visits to the nurse, all but three for illness or injury, and was sent home on nine of those occasions. A61-62. Seven of the visits were for gastro-intestinal problems and five were for vomiting. A64-66.

(3)     The Hearing Officer erred in concluding that J.C.'s claim to eligibility as a student with Other Health Impairment rested only on his diagnosis of Crohn's disease. In fact, as both the independent school psychologist, Dr. Margaret Kay, and the East Pennsboro School District found, J.C. is eligible for services under IDEA as a student with Other Health Impairment based on Attention Deficit Disorder/Inattentive type. Dr. Kay found that on the BASC-2, J.C.'s scores were in the Clinically Significant range for Attention Problems, Conduct Problems and Somatization. P-6 at 21. She found that on the Auditory Attention subtest of the Woodcock-Johnson-III-NU/Tests of Cognitive Abilities, J.C. tested in the 0.2%ile, or a grade level of late kindergarten (K.9). A186. J.C.'s scores on all five clusters

of the Brown Attention Deficit Disorder Scales indicated a High Probability of Attention Deficit Disorder. A186-187. On the Conner's 3rd Edition, J.C. rated himself as at risk for inattention and learning problems, whereas his parents rated him as functioning within the Clinically Significant range for inattention, learning problems and executive functioning. The results showed that J.C. experienced poor concentration and attention skills, struggled to complete his school assignments and had difficulty starting and finishing tasks. He had become increasingly argumentative and irritable and this affected him not only academically but also socially and in his home life.

(4)    The District Court held correctly that the Hearing Officer erred in concluding that the parents were required to prove that J.C.'s poor academic performance was caused *solely* by Crohn's disease. A16. Both the Hearing Officer and the District made much of the requests of J.C.'s physician that J.C. be allowed to have liberal bathroom privileges and suggested that the physician's failure to request other accommodations meant that J.C. did not need other accommodations to perform satisfactorily in school. This reasoning is faulty, since the physician is neither a psychologist nor an educator, and nothing in the record suggests that he evaluated the impact of Crohn's disease on J.C.'s academic and social functioning, or that he had the credentials to do so.

(5)     At the same time, the Hearing Officer erred in essentially ignoring the analysis of the independent evaluator, admitted in evidence by agreement of the parties, that amply documented the educational impact on J.C. of severe and worsening Crohn's disease. After a review of J.C.'s school records and extensive testing, the independent evaluator concluded that Crohn's disease affected J.C. in the following ways:

> Although [J.C.]  has been treated medically for the disease, the problem is chronic, results in malabsorption of foods digested and has resulted in severe weight loss, impaired physical growth, vitamin and mineral deficiencies and chronic fatigue.
>
> [J.C.] has also experienced the physical, emotional, social, family and academic problems that occur as a result of a chronic Crohn's condition. He has had mood swings due to illness and medication, blames himself for the disease, is frustrated with his physical problems and feels different from his peers. He experiences feelings of anger, worries about his appearance, slow growth and weight loss, feels vulnerable and is unable to rely on his body to function normally.
>
> [J.C.] is unable to keep up with his friends, cannot cope with being teased by his classmates, is embarrassed about his frequent bathroom use and has undergone increased peer pressure because of his food choices. He is also unable to handle other people's lack of knowledge about the disease, experiences significantly diminished physical stamina, is unable to concentrate on his schoolwork and struggles to channel his frustration when he is feeling angry. These problems have significantly sapped his strength and vitality and have interfered with every  aspect of his daily life.

A188.

(5)     Since, as discussed above, J.C. performed poorly in school when he

was present, it is not necessary to prove his eligibility by showing that most of his absences were the direct result of a flare-up of Crohn's disease, as the Hearing Officer seemed to assume. The more significant flaw in the Hearing Officer's reasoning is that he ignored the findings of the independent evaluator who found that J.C. had Attention Deficit Hyperactivity Disorder/Inattentive type. The evaluator's findings would stand whether or not J.C.'s ADHD was caused by Crohn's disease; nevertheless, in her professional opinion, Crohn's disease contributed, at the very least, to J.C.'s lack of concentration, frustration, fatigue and lack of energy.

(6)     The record shows that most of J.C.'s absences (apart from disciplinary suspensions) were because of illness. Of J.C.'s 45 absences and 8 tardies during the 2013-14 school year, 35 absences were excused and 9 were unlawful. Of the excused absences, 19 were for out of school suspensions. Of the rest, 18 absences and tardies were medically excused, and another 6 were excused with the notation that J.C. was sick. A157-158.  The unrebutted evidence presented by the parents showed that manifestations of Crohn's disease caused J.C. to be absent. No evidence on the record suggested that unrelated medical reasons caused J.C. to incur excused absences.

(7)     As discussed above, the parents presented abundant evidence that J.C. was eligible under IDEA as a student with Other Health Impairment. Even if he did

not have Crohn's disease and even if he had incurred minimal absences, he would still be eligible under IDEA because of his ADHD, as the IEE and the East Pennsboro evaluation found.

The District Court noted that although the hearing officer acknowledged that "[s]urely, at least some absences are attributable to Crohn's", A49, he ignored the possibility that, "even if outside factors contributed to J.C.'s declining performance, J.C.'s Crohn's disease was also negatively affecting his education." *Id.* The Court rejected the Hearing Officer's conclusion that "there was no evidence that suggested special education was required as a result of Crohn's disease, and that [J.C.'s] poor performance is not linked to Crohn's disease 'at all,'" A49, because "the record indicates that J.C. struggled in math as early as 2010, increased his visits to the school nurse several times for complications from his Crohn's disease, and other school officials were aware of J.C.'s diagnosis, and difficulties with attendance and punctuality due to his diagnosis." A17.

The District Court noted that the Hearing Officer refused to attribute J.C.'s absences from school to Crohn's disease, even though J.C.'s physician sent a note to the District in March, 2014, while the district's evaluation was pending, stating that "[J.C.] has moderate disease severity...[and] may miss school when he has a flare of the disease, as well as for his routine remicade infusions that are every four weeks, and his visits to our clinic." A83.

Other cases involving students with Crohn's disease show that the condition is often associated with extensive absences, depression and loss of motivation. *See, e.g., Boston Public Schools,* 109 LRP 48225 (Massachusetts State Educational Agency, No. 06-6508, August 11, 2006) (granting summary judgment to a student with Crohn's disease who sought to repeat 9th grade for a second time as a reasonable accommodation to his disability); *Board of Education of the Ramapo Central School District,* 106 LRP 24184 (New York State Educational Agency, 92-5, 92-6 (February 20, 1992) (reversing decision of an Independent Hearing Officer approving decision of school district to exit a student with Crohn's disease from special education without obtaining a medical examination from a school physician).

>    **2.     The Hearing Officer Erred in Concluding that J.C. Did Not Need Specially Designed Instruction If His Overall Academic Achievement was Satisfactory.**

Both the Hearing Officer and the District, in its Brief, argue that although J.C.'s Crohn's disease met the first prong of IDEA eligibility, a health condition that caused "limited vitality," but did not meet the second prong, a need for specially designed instruction. App. Br. at 15-17. Both rely on the premise that J.C.'s overall academic performance was satisfactory and that therefore, he had no need for specially designed instruction. As we have shown, that performance was very far from satisfactory, but even if it had been satisfactory, it is legal error to

conclude that this is the only standard for determining whether a student needs

specially designed instruction.  In other cases concerning students whose

difficulties in school were behavioral, attentional or focused on a particular area of

need, courts have rejected "overall academic performance" as the only criterion for

eligibility.

For example, in *Doe v. Cape Elizabeth Sch. Dist.,* 832 F.3d 69 (1st Cir.

2016), the Court of Appeals rejected the District Court's reliance on a student's

"overall academic achievements" without assessing the impact of the specific

needs arising from her disability in reading fluency. 832 F.3d at 81.  Similarly, in

*L.J. v. Pittsburg Unified Sch. Dist.,* 835 F.3d 1168 (9th Cir. 2016), the Court of

Appeals reversed a decision that an emotionally troubled student was not eligible

for special education services because of his satisfactory performance in general

education classes.  *See also Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 150 (2d

Cir. 2002) (student with chronic fatigue syndrome and fibromyalgia who was

unable to attend school adequately stated a claim that she had a disability although

she was not learning disabled); *Mr. I v. Me. Sch. Admin. Dist. 55*, 416 F. Supp. 2d

147, 156 (D. Me. 2006) (depression that adversely affects educational performance

may cause a student to need special education); *Elida Local Sch. Dist. Bd. of Educ.

v. Erickson*, 252 F. Supp. 2d 476, 488-89 (N.D. Ohio 2003) (student who could not

adequately control her impulses, had difficulty finishing her assignments and

prioritizing class work and had poor peer relationships was eligible for special education to enable her to compete on an equal ground).

These decisions are in accord with the well-established principle that a child who is suspected of having a disability must be identified "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability … even if the child is advancing from grade to grade." *Jana K. v. Annville-Cleona Sch. Dist.,* 39 F. Supp. 3d at 600-601, *citing W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir. 1995); *D. K. v. Abington Sch. Dist.,* 696 F.3d 233, 249 (3d Cir. 2012) (citing 34 C.F.R. § 300.111(c)(1); *Bd. of Educ. v. L.M..,* 478 F.3d 307, 313 (6th Cir. 2007); *Taylor v. Altoona Area Sch. Dist.,* 737 F. Supp. 2d 474, 484 (W.D. Pa. 2010).

In the present case, the Hearing Officer committed legal error when he ignored the "relevant consideration" that during the several years before the District evaluated J.C., his "emotional well-being and academic performance were clearly declining." *See Jana K.,* 39 F. Supp. 3d at 604. The Hearing Officer acknowledged that J.C.'s Crohn's disease has caused him to experience "limited vitality" within the meaning of IDEA's definition of "Other Health Impairment," one of the thirteen categories of eligibility under IDEA. *See* 34 C.F.R. § 300.8(c)(8). However, he erred in holding that J.C.'s health impairment has not had an adverse effect on J.C.'s education.

The District counters the District Court's conclusion that the District failed adequately to evaluate and address J.C.'s educational needs with the assertion that to find J.C. eligible as a student with Other Health Impairment, one would have to prove that "a disease of the digestive system require[s] adapting the content, methodology or delivery of the academic curriculum." App. Br. at 17. This *reductio ad absurdum* misstates the parents' burden, which, as the District Court correctly concluded, was to establish that it was more likely than not that his declining performance and attendance were attributed to his disability. A16. Obviously, the Parents do not claim that J.C. needs specially designed instruction to correct his difficulties with digestion. Rather, they claim, and have proven, that J.C. needs specially designed instruction because his health impairments have rendered him unavailable for learning for a significant amount of the time, either by being absent, physically ill, taking time out of class to visit the nurse or the bathroom, or so fatigued that he falls asleep in class. It bears repeating that the District is able to articulate its *reductio ad absurdum* only by ignoring the abundant evidence that J.C. has ADHD as well as Crohn's disease and that this adversely affects his educational performance.

When J.C. moved to the East Pennsboro School District, he received an IEP that does provide for specially designed instruction and for modification of the content, methodology and delivery of academic instruction. *See* A163 (IEP

provides for training in assignment completion and organizational skill development); A271 (specially designed instruction includes provision of teachers' and peers' notes from classes that J.C. misses; individualized clarification from teachers or designated peers as needed; possible modification of physical education curriculum).

### C. The District Court Did Not Err When It Reversed the Hearing Officer and Held that the District Violated Its Child Find Duty Under Section 504.

#### 1. The District, Not the Parents, Was Responsible for Failing to Identify J.C. as a Student with Disabilities.

The District determined that J.C. was a protected handicapped student in March, 2014. The District Court held that the District should have identified J.C. as an eligible student long before that and that the Hearing Officer erred in holding that the District had not violated its obligation to identify and evaluate J.C. as a child with a disability before March, 2014.

Under Section 504, a protected handicapped student is entitled to a free, appropriate public education, although the meaning of that term is somewhat different under Section 504 from the comparable term under IDEA. *See Lauren G. v. West Chester Area Sch. Dist.,* 906 F. Supp. 2d 375, 394-395 (E.D. Pa. 2012) (student entitled to a substantive remedy under Section 504 for Child Find violation).

The Hearing Officer applied an improperly limited interpretation of a school district's obligations under Section 504. Under the Section 504 education regulation, 34 C.F.R. § 104.4(b), "discrimination" does not mean only "different treatment." Discriminatory actions prohibited include "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or "Provid[ing] a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others." Here, by failing to consider J.C. for eligibility for services under Section 504 before March 2014, the District failed to provide J.C. with aids, benefits and services that were as effective as those provided to other students and did not afford him an opportunity to participate in the educational services of the District that was equal to that afforded others.

The Hearing Officer's holding that J.C. was not eligible for services under Section 504 before March, 2014 is belied by the evidence, summarized in the previous section, that J.C.'s disability significantly affected his performance in school long before the spring of 2014, and that his needs did not suddenly change in 2014. The Hearing Officer improperly justified his holding by citing the asserted failure of the Parents to provide sufficient information to the District about their son's disabilities and their impact on his academic and social performance in school. It is settled law in this jurisdiction that a school district may not be

absolved of its Child Find duty by the failure of the child's Parents to identify the deficiencies in their child's educational services. As this Court held in *M.C. ex rel. J.C. v. Central Regional Sch. Dist.,* 81 F.3d 389 (3d Cir. 1996):

> [A] child's entitlement to special education should not depend upon the vigilance of the Parents (who may not be sufficiently sophisticated to comprehend the problem) …. Rather, it is the responsibility of the child's teachers, therapists, and administrators . . . to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*Id.* at 397. *See Jana K. v. Annville-Cleona Sch. Dist.,* 39 F. Supp. 3d 584, 602 (M.D. Pa. 2014).

> **2.** **The District Stood by as J.C. Experienced a Pervasive Loss of Educational Benefit Without Considering His Need for Accommodations and Specially Designed Instruction.**

During the statutory limitations period, from January 29, 2012 (two years before the Due Process Complaint was filed) to the time J.C. left the District after the end of the 2013-14 school year, the District failed to ascertain J.C.'s educational needs and respond to declining achievement. On a standard measure of intelligence, J.C. scored in the 68th percentile. A171. Until his sixth grade year, J.C.'s performance in school was commensurate with his ability. When the manifestation of his Crohn's disease worsened, he began to miss a great deal of school. He failed a number of subjects during his seventh, eighth, ninth and tenth grade years in Cumberland Valley. He finished tenth grade on homebound

instruction and had to repeat the year in East Pennsboro due to failure in a number of subjects. A231-232; N.T. 111, 222, 225, 250, 136-37, 355, 383; A98, A100.

In elementary school and the first year of middle school, J.C. scored mostly "Proficient" and "Advanced" on the Pennsylvania System of School Assessment (PSSAs) and the District's own "benchmark" testing. However, by 8th grade, most of his scores on these tests were in the "Basic" and "Below Basic" range, which is far below the level of achievement that would be expected given J.C.'s intellectual ability. N.T. 148; A235; *see also* N.T. 213 and A169 (J.C. scored Below Basic on school-wide tests in reading and math in 8th and ninth grades).

The District did little to address this pattern of decline and severe underachievement. It did not seek to evaluate J.C. to determine whether he needed accommodations under Section 504, let alone special education services. Although the Parents made repeated requests for tutoring, the District failed to provide any individualized assistance. N.T. 307, 385. For example, although the eighth grade algebra class that J.C. failed was a small class of only 12 to 14 students, and although the teacher of that course indicated that he had many opportunities to pull aside students who struggled in his class for extra help, he could not remember ever having done that with J.C. N.T. 193-195. Despite J.C.'s worsening attendance record, the record does not indicate that the District took any action in response to his non-attendance. N.T. 239-40.

### 3. The Hearing Officer Ignored Relevant Evidence and Made Other Errors of Law and Fact.

The Hearing Officer's legal error was premised on other errors of law and fact. First, the Hearing Officer erroneously held that because J.C. had done well in school during the first few years after his initial diagnosis, his Crohn's disease must not have an adverse effect on his education. This improperly assumes that Crohn's disease does not change over time, that it is static and unchanging as a child grows and develops (and, in J.C.'s case, fails to develop normally because of years of slow growth and lack of nourishment caused by the disease). Whether Crohn's disease affected J.C. differently in high school than in middle school, and specifically whether it caused a large number of the absences that, as the hearing officer acknowledges, rendered him unavailable for learning, is something the District should have investigated when it evaluated J.C., but did not.

Second, the Hearing Officer erroneously found that J.C.'s academic performance in 9th grade was satisfactory, and that this was further evidence that his health impairment and his absences did not adversely affect his education. The Hearing Officer cited as evidence of satisfactory performance J.C.'s grade point average of 74.5 and his passing "all academic classes." The Hearing Officer acknowledged that J.C. failed physical education in 9th grade but did not acknowledge that he also failed Introduction to Business. More to the point, it is remarkable that the Hearing Officer considered a GPA of 74.5 to be satisfactory

performance for a student with above-average intelligence. A GPA of 74.5 is less than five points above failing. It is a D average.

To accept this as satisfactory performance for a student with disabilities is deeply inconsistent with the legal standards for educating students with disabilities announced by the United States Supreme Court in *Endrew F. v. Douglas County Sch. Dist. RE-1,* 137 S. Ct. 988 (2017). The *Endrew F.* standards require school districts to enable the child to make progress that is "appropriate in light of the child's circumstances. 137 S. Ct. at 999. "The child's circumstances" means, specifically, "the child's present levels of achievement, disability, and potential for growth." *Id., citing* 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv). School districts must offer educational programs that "meet the unique needs of the child." 137 S. Ct. at 1000, and that are "appropriately ambitious in light of his circumstances." This means that "[e]very child should have the chance to meet challenging objectives." 137 S. Ct. at 1000.

The Hearing Officer also ignored J.C.'s poor performance on the Keystone examination in mathematics (which, according to the Hearing Officer, was a subject in which J.C. was strong) during 9th grade. Testimony at the hearing established that the Keystone examination administered in 9th grade was aligned with the mathematics curriculum that J.C. was expected to learn in 8th and 9th

grade. A score of "Below Basic" does not show satisfactory progress, nor does it show progress commensurate with J.C.'s ability.

Third, the Hearing Officer improperly ignored J.C.'s Attention Deficit Disorder (ADHD) as a basis for eligibility. Although the record supports the conclusion that J.C.'s difficulty concentrating, focusing and attending is one of the sequelae of his Crohn's disease, it is clear that regardless of the etiology of J.C.'s ADHD, he experienced that condition to a clinically significant degree and that it adversely affected his education. The Independent Educational Evaluator , Margaret Kay, illustrated that impact vividly in her Independent Educational Evaluation. A188.

Fourth, the Hearing Officer improperly ignored the results of Dr. Kay's evaluation. The Hearing Officer rejected Dr. Kay's conclusion that J.C. has a specific learning difficulty in mathematics, based on J.C.'s difficulty with basic mathematics operations, and he simply ignored her finding that J.C. has ADHD, based on testing in the clinically significant range in measures of attention and concentration on a number of standardized tests.  He dismissed the report as "conclusory," although it contains far more analysis than the District's Evaluation Report.

Finally, the Hearing Officer committed legal error by holding that the Parents had the burden to prove that their son's absences were due to Crohn's

disease. To the contrary, the Parents' burden in this proceeding was to show that the District violated its Child Find duty and that its conclusion that J.C. is not eligible under IDEA as a student with Other Health Impairment was erroneous. The Parents have met their burden on both counts. Ample evidence on the record demonstrates that J.C. is a child with Other Health Impairment whose difficulty attending, focusing and concentrating, as well as his limited strength, vitality and alertness adversely affects his academic performance. The unrebutted evidence of record shows that the District knew of J.C's Crohn's disease and related health problems and that it knew that at least some of his absences were due to Crohn's disease. The evidence shows that the District knew of J.C.'s steadily increasing absences, his declining academic progress and his declining performance on standardized tests. It was the District's obligation to investigate whether the absences and consequent declining performance in school were due to a disability or not. This it failed to do.

Rather, the record shows that over a period of years (not just within the limitations period of this action), the District assumed that which it was required to determine. It declined to evaluate J.C. to determine whether his absences and poor performance were manifestations of a disability because, according to the District's special education director, it assumed that J.C.'s absences and poor performance were due to family issues, involvement with agencies outside school and

(according to the District but never substantiated) possible use of marijuana. It is apparent that the District dismissed J.C.'s profound difficulties in school (failing multiple courses and being retained in tenth grade) because it imagined they must be his own fault and that of his family.

## IX.  CONCLUSION.

For the foregoing reasons, the Parents respectfully ask the Court to affirm the findings of the District Court that the Cumberland Valley School District violated its obligation to conduct an adequate evaluation of J.C.'s eligibility for services under the Individuals with Disabilities Education Act; that the District violated its Child Find obligations under the IDEA and that the District violated its obligations under Section 504 and the Rehabilitation Act. The Parents further ask the Court to find that J.C. is entitled to compensatory education for failing to provide appropriate special education supports and services to J.C. under IDEA and Section 504 and affirm the joint order awarding a stipulated amount of compensatory education. The Court should remand the case to the District Court to consider the amount of attorney fees to which the Parents may be entitled.

Respectfully submitted,

Dated:  <u>July 25, 2018</u>                      /s/Judith A. Gran
                                                Attorney ID No. 40134
                                                REISMAN CAROLLA GRAN LLP
                                                19 Chestnut Street
                                                Haddonfield, NJ 08033
                                                (856) 354-0061
                                                (856) 873-5640 (FAX)
                                                judith@rcglawoffices.com

                                                /s/ Phillip A. Drumheiser
                                                Attorney I.D. No. 90003
                                                P.O. Box 890
                                                Carlisle, PA 17013
                                                (717) 245-2688
                                                (717) 258-4408 (fax)
                                                pdrumheiser@epix.net

## CERTIFICATION OF BAR MEMBERSHIP

I, Judith A. Gran, hereby certify that I have duly been admitted to the bar of the Court of Appeals for the Third Circuit.

July 25, 2018                                    Reisman Carolla Gran LLP

By: /s/Judith A. Gran PA 40134

## CERTIFICATION OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT, TYPEFACE
## REQUIREMENTS AND TYPE STYLE REQUIREMENTS

I hereby certify that the foregoing Brief of apart from the cover page, Table of Contents, Table of Authorities, caption and signature block,  contains 8,896 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). In calculating the number of words, I have relied upon the Word Count feature of Microsoft™ Word for Mac, version 15.33, the program that was used to prepare this Brief.

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface including serifs, in 14-point font, Times New Roman style.

July 25, 2018                                      Reisman Carolla Gran LLP

                                                           By: /s/Judith A. Gran PA 40134

**CERTIFICATION OF IDENTITY OF BRIEFS**

I, Judith A. Gran, hereby certify that the text of the electronic Brief filed and served with the Court in PDF format is identical to the Brief provided in hard copy to the Clerk's Office.

July 25, 2018                                    Reisman Carolla Gran LLP

                                                By: /s/Judith A. Gran PA 40134

## CERTIFICATION OF VIRUS CHECK

I, Judith A. Gran, hereby certify that the foregoing Brief filed in the Court's Electronic Case Filing System has been checked for viruses, malware and adware using Kaspersky Internet Security version 18.0.

July 25, 2018                                              Reisman Carolla Gran LLP

                                                          By: /s/Judith A. Gran PA 40134

**CERTIFICATE OF SERVICE**

I, Judith Gran, do hereby certify that on this 25th day of July, 2018, I served

a copy of the foregoing Brief of Appellees upon the following counsel of record by

depositing it for filing in the Court's Electronic Case Filing (ECF) system, which

causes a copy of the filing to be sent automatically to all counsel of record:

Mark C. Walz, Esquire
SWEET, STEVENS, KATZ & WILLIAMS LLP
331 E. Butler Avenue
P.O. Box 5069
New Britain, PA 18901
215-345-9111
Fax: 2153481147
Email: mwalz@sweetstevens.com

/s/ Judith A. Gran